IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MARSHA SPARKS,

                    Plaintiff,                    CV-05-1726-ST

        v.                            OPINION AND ORDER

JO ANNE B. BARNHART,
Commissioner of Social Security
Administration,

                    Defendant.

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Marsha C. Sparks ("Sparks"), brings this action pursuant to 42 USC §§ 405(g)

and 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social

Security denying her application for Disability Insurance Benefits ("DIB") under Title II of the

Social Security Act and Supplemental Security Income ("SSI") disability benefits under

Title XVI of the Social Security Act.

1 - OPINION AND ORDER

The parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c). For the reasons that follow, the Commissioner's decision is reversed and this case is remanded for further administrative proceedings for a psychiatric evaluation and examination by a migraine specialist.

## BACKGROUND

At the time of the ALJ's decision, Sparks was 47 years old and had a high school education. Tr. 100, 115.[1] She filed applications for DIB and SSI on October 24, 2002 (Tr. 100-02, 309-12), alleging disability beginning on October 9, 2002, due to severe sulfite allergy, Irritable Bowel Syndrome ("IBS") and Temporomandibular Joint Dysfunction ("TMJD"). Tr. 109. Both applications were denied initially and on reconsideration. Tr. 56-61, 63-64, 313-21. Sparks requested a hearing, which was held before Administrative Law Judge ("ALJ") Joseph D. Schloss on March 8, 2004, and continued to May 24, 2004. Tr. 360-99. On July 23, 2004, the ALJ issued a decision finding Sparks not disabled within the meaning of the Social Security Act because she was capable of performing her past relevant work. Tr. 47-55. That decision became the final order of the Commissioner on September 20, 2005, when the Appeals Council denied Sparks' request for review. Tr. 7-10. Sparks now seeks judicial review of the Commissioner's decision.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of no less than 12 months[.]"

---

[1] Citations are to the page(s) indicated in the official transcript of the record filed with the Commissioner's Answer.

2 - OPINION AND ORDER

42 USC § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995), *cert denied*, 517 US 1122 (1996) (citations omitted). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 CFR §§ 404.1520, 416.920. Below is a summary of the five steps, which also are described in *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999):

At step one, the Commissioner determines whether the claimant is engaged in substantial gainful activity. If so, the claimant is not disabled. If not, then the Commissioner proceeds to step two. 20 CFR §§ 404.1520(b), 416.920(b).

At step two, the Commissioner determines whether the claimant has one or more severe impairments. If not, the claimant is not disabled. If the claimant has a severe impairment, then the Commissioner proceeds to step three. 20 CFR §§ 404.1520(c), 416.920(c).

At step three, the Commissioner determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 CFR Part 404, Subpart P, Appendix 1 ("Listing of Impairments"). If so, the claimant is disabled. If the impairment does not meet or equal one of the listed impairments, then the Commissioner proceeds to step four. 20 CFR §§ 404.1520(d), 416.920(d).

If the adjudication proceeds beyond step three, the Commissioner must determine the claimant's residual functional capacity ("RFC"). The RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by the impairments. 20 CFR §§ 404.1545(a), 416.920(e), 416.945; Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the Commissioner determines whether the claimant is able to perform work he or she has done in the past.  If so, the claimant is not disabled.  If the claimant demonstrates that he or she cannot perform work done in the past, the Commissioner proceeds to step five. 20 CFR §§ 404.1520(e), 416.920(e).

Finally, at step five, the Commissioner determines whether the claimant is able to do any other work.  If not, the claimant is disabled.  If the Commissioner finds the claimant is able to do other work, the Commissioner must show a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert ("VE") or by reference to the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates a significant number of jobs exist in the national economy that the claimant can do, then the claimant is not disabled. If the Commissioner does not meet this burden, the claimant is disabled.  20 CFR §§ 404.1520(f), 404.1566, 416.920(f).

At steps one through four, the burden of proof is on the claimant.  *Tackett*, 180 F3d at 1098.  However, at step five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  *Id.*

## **THE ALJ'S FINDINGS**

At step one, the ALJ found that Sparks had not engaged in substantial gainful activity since her alleged disability onset date.  Tr. 48, 54.

At step two, the ALJ found that although the treatment records discuss a number of other conditions, a sulfite allergy was Sparks' only severe impairment.  Tr. 50, 54.

At step three, the ALJ found that Sparks' impairments did not meet or equal the requirements of a listed impairment. *Id.* The ALJ determined that Sparks retained a RFC "which is not limited by exertional factors, but is subject to the limitation of avoiding contact with sulfites." Tr. 53, 54.

At step four, the ALJ found that Sparks was able to perform her past relevant work as an airline customer service agent, airline ticket agent, and childcare worker. *Id.*

Because the ALJ found that Sparks could perform her past relevant work, he did not make findings at step five of the sequential evaluation process.

## STANDARD OF REVIEW

District courts have the power to affirm, modify or reverse the decision of the Commissioner, with or without remanding the case. 42 USC § 405(g). The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir), *cert denied*, 531 US 1038 (2000). The issue turns on the utility of further proceedings. *Id.*

The Commissioner's decision must be affirmed if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 USC § 405(g); *see also Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews*, 53 F3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986) (citations

omitted). The Commissioner's decision must be upheld, however, even if "the evidence is

susceptible to more than one rational interpretation." *Andrews*, 53 F3d at 1039-40.

## DISCUSSION

Sparks requests that the case be remanded to the Commissioner for further proceedings or,

alternatively, for the payment of benefits because: (1) the Appeals Council failed to provide clear

and convincing evidence to reject evidence submitted after the ALJ's decision; (2) the ALJ failed

to develop the record fully and fairly; (3) the ALJ erred in finding that Sparks only suffers from

one severe impairment (sulfite allergy); (4) the ALJ failed to adequately consider equivalence to a

listing; (5) the ALJ failed to consider Sparks' impairments in combination in his RFC analysis;

(6) the ALJ erred in finding Sparks could return to past relevant work; and (7) to the extent that

the ALJ erred at step four of the analysis, the ALJ failed to obtain VE testimony at step five.

## I. **Incomplete Record**

The ALJ noted that Sparks' treating physician, Ellen Michaelson, MD, had received some

documents from Sparks' previous health care provider, Kaiser Permanente ("Kaiser"), which are

not contained in the administrative record. Tr. 52. Accordingly, the ALJ concluded that the

treatment record supplied by Kaiser was "incomplete, but how incomplete, or why it is

incomplete is unknown." Tr. 53.

The ALJ has a duty to develop the record fully and fairly. 42 USC § 405(d);

20 CFR §§ 404.950(d) and 404.1527(c)(3). This duty "exists even when the claimant is

represented by counsel." *Smolen v. Chater*, 80 F3d 1273, 1288 (9th Cir 1996) (citation omitted).

The ALJ must recontact the claimant's physician for additional evidence "[1] when the report

from [the] medical source contains a conflict or ambiguity that must be resolved, [2] *the report*

*does not contain all the necessary information*, or [3] does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 CFR § 416.912(e)(1) (emphasis added).

Even if the administrative record did not contain all of Kaiser's records, the ALJ's self-professed failure to obtain those records would have made no difference in his decision. Another treating physician, Dr. Michaelson reviewed the potentially missing records in making her own assessments and diagnoses, and the ALJ relied on Dr. Michaelson's opinions in his findings.

## II.  New Evidence Submitted to the Appeals Council

Sparks also alleges that the Appeals Council failed to provide clear and convincing evidence for rejecting new evidence submitted after the date of the ALJ's decision. Therefore, Sparks requests a remand for proper consideration of this new evidence. The Commissioner responds that the new evidence is neither material nor relevant.

The new evidence submitted to the Appeals Council included treatment records from Oregon Health & Science University ("OHSU") from October 6, 2004, to February 12, 2005; from Hawthorne Holistic Health Care for the period December 11, 2004, to January 26, 2005; and from Lutheran Family Service dated January 24, 2005. Tr. 15-40. All this evidence is dated after July 23, 2004, the date of the ALJ's decision. Tr. 8. As a result, the Appeals Council decided that it did not affect the decision on Sparks' disability. Tr. 8.

### A.  Legal Standard

A decision of the Appeals Council to deny a request for review is not a final decision subject to judicial review. 20 CFR §§ 404.981, 416.1481. *See also Russell v. Bowen,* 856 F2d 81, 83-84 (9th Cir 1988). However, when the Appeals Council considers materials not seen by the

ALJ and concludes that the materials provide no basis for review of the ALJ's decision, a reviewing court may consider the additional materials when it determines whether there is substantial evidence supporting the Commissioner's decision. *Harman*, 211 F3d at 1180; *see also Ramirez v. Shalala*, 8 F3d 1449, 1451-52 (9th Cir 1993). The Appeals Council is required to consider "new and material evidence" that "relates to the period on or before the date of the administrative law judge hearing decision." 20 CFR § 404.970(b). Evidence is material where it bears "directly and substantially on the matter in dispute." *Mayes v. Massanari*, 276 F3d 453, 462 (9th Cir 2001) (citation omitted). The claimant must demonstrate "there is a reasonable possibility that the new evidence would have changed the outcome of the administrative hearing." *Id*, citing *Booz v. Sec'y of Health & Human Servs.*, 734 F2d 1378, 1380 (9th Cir 1984).

### B. <u>Analysis</u>

At issue is whether the new evidence is material and relates back to the period between Sparks' alleged onset date (October 9, 2002) and the date of the ALJ's decision (July 23, 2004). If it does and if there is a reasonable possibility that it would have changed the outcome of the ALJ's decision, then a remand is necessary.

Sparks alleges that she suffers from several medically determinable impairments that are severe (including sulfite allergy, IBS, TMJD, and possible anxiety disorder) and that the new evidence submitted to the Appeals Council documents these disorders and accompanying symptoms, which are highly supportive of a finding of disability.

Whether this new evidence makes a remand necessary necessitates a discussion of the ALJ's severity findings at step two. Thus, this court will address the materiality of the new evidence as part of its analysis of the ALJ's step two findings.

### III.  <u>Step Two Severity Findings</u>

### A.  <u>Legal Standard</u>

The "severity inquiry permits the Secretary to identify efficiently those claimants whose impairments are so slight that they are unlikely to be found disabled even if the individual's age, education, and experience are considered."  *Corrao v. Shalala*, 20 F3d 943, 949 (9th Cir 1994) (citations omitted).  Pursuant to the Commissioner's interpretive guidelines, an impairment or combination of impairments is found "not severe" at step two when the evidence establishes "only a slight abnormality or combination of slight abnormalities" which have "no more than a minimal effect on . . . his or her physical or mental ability(ies) to perform basic work activities." SSR 85-28, 1985 WL 56856, *3 (1985); *Yuckert v. Bowen*, 841 F2d 303, 306 (9th Cir 1988) (adopting SSR 85-28).

The Social Security Regulations give the following guidance in determining whether an impairment is severe:

> (a) Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.
> (b) Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include–
>> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
>> (2) Capacities for seeing, hearing, and speaking;
>> (3) Understanding, carrying out, and remembering simple instructions;
>> (4) Use of judgment;
>> (5) Responding appropriately to supervision, co-workers and usual work situations; and
>> (6) Dealing with changes in a routine work setting.

20 CFR §§ 404.1521, 416.921.

A claimant must prove the physical or mental impairment by providing medical evidence consisting of signs, symptoms and laboratory findings; the claimant's statement of symptoms alone will not suffice. *See* 20 CFR §§ 404.1508, 416.908. Under no circumstances may the existence of an impairment be established on the basis of symptoms alone. SSR 96-4p, 1996 WL 374187, *1 n2 (July 2, 1996), cited by *Ukulov v. Barnhart*, 420 F3d 1002, 1005 (9th Cir 2005) (footnote omitted). "[S]ymptoms . . . are an individual's own perception or description of the impact of his or her physical or mental impairment(s) . . . [W]hen any of these manifestations is an anatomical, physiological, or psychological abnormality that can be shown by medically acceptable clinical diagnostic techniques, it represents a medical 'sign' rather than a 'symptom.'" *Id*. A determination of the severity of an impairment requires the ALJ to evaluate the medical findings describing the effects on the claimant's physical and mental ability to perform basic work activities. SSR 85-28, 1985 WL 56856, *4.

## B. <u>Analysis</u>

Sparks contends that the ALJ erred at step two by failing to find that she suffers from the severe impairments of: (1) mental impairments; (2) chronic headaches; (3) fatigue; and (4) gastrointestinal problems (including IBS). As discussed below, new evidence submitted to the Appeals Council requires a further development of the record to obtain a psychiatric evaluation and an examination by a migraine specialist. Otherwise, the ALJ did not err at step two.

### 1. <u>Mental Impairments</u>

Sparks challenges the ALJ's analysis of the severity of her mental impairments as inadequate and requests a remand of the case for a psychiatric evaluation which she claims was recommended by both her treating primary care provider and the medical expert at the hearing.

She also believes that new evidence submitted to the Appeals Council documents that she suffers from several severe impairments, including a possible anxiety disorder.

The ALJ did not make any severity findings specifically on the issue of mental impairments, only mentioning that Sparks reported a long history of depression during a food allergy consultation at OHSU on August 27, 2003.  Tr. 49.  He found Sparks to be less than credible when she testified that her problems had caused a decrease in concentration and comprehension (Tr. 374) because the various forms and reports she had completed showed an "impressive" level of detail and amount of commentary.  Tr. 51.

The record before the ALJ supports his failure to find that Sparks suffers from a severe mental impairment and to obtain a consultive examination regarding any mental impairment. Sparks did not allege a mental health condition in her disability applications.  At the hearing, the ALJ asked whether she had seen a psychiatrist or psychologist at any time from October 2002, and Sparks answered that she had not.  Tr. 399.  During the period reviewed by the ALJ, the record contains no objective evidence of any mental impairment.  None of Sparks' medical providers up to that date had diagnosed a mental impairment or recommended that she undergo a psychiatric evaluation.  Despite Sparks' argument to the contrary, this is also true of Lawrence Duckler, MD, the medical expert who testified at the hearing.  When asked by the ALJ whether any of Sparks' doctors had mentioned any potential for psychiatric testing and/or consultations, Dr. Duckler testified that he did not see any mention of psychiatric testing in Sparks' medical chart.  Tr. 389.  He then observed that "it's very common of [IBS] to suggest psychiatric evaluation, but evidently her physicians haven't chosen that route."  *Id*.  This is a comment on the evidence, not, as Sparks argues, a recommendation for a psychiatric evaluation.

The ALJ was obligated to obtain a psychiatric evaluation if a medical report contains a conflict or ambiguity that must be resolved, does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. 20 CFR § 416.912(e)(1). At the time of the hearing, the ALJ was faced with none of these three scenarios and, therefore, had no reason to further develop the record.

However, Sparks presented new evidence to the Appeals Council regarding possible mental impairments. On December 4, 2004, Sparks was seen by J. Bruin Rugge, MD, at OHSU, for labored breathing and an allergic reaction. Tr. 32. She described mild swelling in her lips the previous night and waking up worried about an allergic reaction. *Id*. She also complained of lightheadedness, not getting enough oxygen, and intermittent chest pain. *Id*. After a physical examination, Dr. Rugge reassured Sparks that her EKG and oxygen levels were both normal and assessed "Acute Anxiety." *Id*. He also noted that she "felt much better." *Id*. On February 2, 2005, Sparks consulted Donald Dibbern, MD, at the allergy clinic. Tr. 27-29. While she denied any depression or anxiety (Tr. 28), Dr. Dibbern suspected "that there may be a possible significant component of anxiety/somatization as an overlay on these multiple food reactions," believed that Sparks "may thus benefit from psychiatric and psychological evaluation," but deferred this issue to her primary care provider. Tr. 29. Her primary care provider during this time was Bruce Marks, FNP, at OHSU. In a February 12, 2005 letter addressed "to whom it may concern," Marks enumerated several conditions including "anxiety disorder with a psychiatric evaluation pending" which, "taken in total, may cause [Sparks] to regularly miss several days of work per week." Tr. 24. Marks referred her to Psychiatry for having "several conditions that

may represent somatization," such as IBS and headaches. Tr. 25. The record does not contain the results of this psychiatric evaluation.

While the new medical evidence post-dates the ALJ's decision, it relates back to evidence before the ALJ, namely Dr. Duckler's observations and Sparks' subjective symptoms. The question is whether there is a reasonable possibility that the new evidence would have changed the outcome of the administrative hearing. Without the results of a psychiatric evaluation, it is unclear whether the new evidence would have done so. Thus, the medical evidence submitted to the Appeals Council requires a remand for development of the record to obtain the results of a psychiatric evaluation.

## 2. **Chronic Headaches**

Sparks also contends that the ALJ erred by making no finding on the severity of her headaches. The ALJ was not presented with any objective medical evidence of chronic headaches. In his analysis of Sparks' subjective symptoms, the ALJ noted that she testified about suffering chronic migraine headaches "once or twice a week which can last as long as three days." Tr. 51, referring to Tr. 373. He also referenced the testimony of Alice Zuber, Sparks' aunt who lives with her, that Sparks sometimes complains of a terrible headache, but mostly of being tired. Tr. 52, referring to Tr. 396. On August 27, 2003, Sparks also complained to Shannon Rentz, a registered dietitian, about migraine headaches she attributed to sulfites. Tr. 281. On March 4, 2004, K. S. Price, MD, of the allergy clinic, assessed a sulfite allergy "with characteristic recurrent flushing and *headaches*." Tr. 278 (emphasis added). The ALJ failed to assign weight to this examining physician's opinion which is uncontradicted.

New evidence submitted to the Appeals Council relates back to Sparks subjective symptoms considered by the ALJ. On September 1, 2004, Marks assessed "migraine headaches"

and approved a refill of Tylenol # 3 for migraine headaches.  Tr. 15.  This was just two months

after the ALJ's decision, suggesting that Sparks was on prescription medication for migraines

during the period reviewed by the ALJ.  However, neither party has pointed out, nor could the

court locate, a medical source prescribing Tylenol # 3 for migraines during the relevant period.

There are multiple records of Sparks requesting Tylenol # 3 for ear pain (Tr. 306), taking it for

pain from dental work (Tr. 263), and taking it for other unspecified reasons (Tr. 241-42, 330)

which may well have been for migraines.

On February 2, 2005, Sparks told allergy specialist Dr. Dibbern about her long history of

migraine headaches and the suspected association with particular foods.  Tr. 27.  She had not seen

a neurologist or headache specialist.  *Id*.  She felt that her symptoms were improved overall,

although she was concerned about having lost 10 pounds in the previous 18 months.  Tr. 27-28.

Dr. Dibbern summarized Sparks' medical history and noted that most of her previous records

were not available for review.  Tr. 27.  After a physical examination, Dr. Dibbern's impression

was that Sparks' food reactions were "largely (non-immunologic) intolerances as opposed to true

allergies," although "comorbidity is possible."  Tr. 29.[2]  He educated Sparks on the difference

between food allergies and food intolerances, gave her a list of common food migraine triggers

and suggested that she see a migraine specialist.  *Id*.  In a "to whom it may concern" letter at

Sparks' request, written on February 15, 2005, Marks listed migraine headaches among several

conditions which may cause Sparks to miss several days of work per week.  Tr. 24.  It is unclear

whether Sparks ever saw a migraine specialist.

---

[2] Comorbidity is "[a] concomitant but unrelated pathologic or disease process; usually used in epidemiology to indicate the coexistence of two or more disease processes."  STEDMANS MEDICAL DICTIONARY (27th ed. 2000).

Had the ALJ reviewed the evidence submitted to the Appeals Council, it reasonably possible that he ALJ would have developed the record to obtain the evaluation of a migraine specialist.  While Dr. Dibbern did not make any assessment or diagnosis of migraine headaches, he suggested that Sparks should see a migraine specialist.[3]  This opinion, coupled with the ALJ's failure to discuss Dr. Price's assessment that Sparks suffers from headaches and any contrary medical evidence, is sufficient to warrant a remand for development of the record to include Sparks' examination by a migraine specialist.

### 3. <u>Chronic Fatigue Syndrome</u>

Next, Sparks contends that the ALJ erred by ignoring evidence in the record that she suffers from chronic fatigue syndrome[4] and requests that the case be remanded for proper consideration of the ignored evidence, but without identifying what the ALJ allegedly ignored.  She does not contend that any post-hearing evidence supports a finding that the impairment of fatigue is severe.

Chronic fatigue syndrome is a subset of chronic fatigue, "a broader category defined as unexplained fatigue of greater than or equal to six months' duration."  Centers for Disease Control, Chronic Fatigue Syndrome - The Revised Case Definition (abridged version), *available at* http://cdc.gov/cfs/cfsdefinitionHCP.htm  (last visited December 7, 2006).  "In clinical practice, no tests can be recommended for the specific purpose of diagnosing chronic fatigue syndrome.

---

[3]  Marks, a Family Nurse Practitioner, also diagnosed chronic migraines.  However, he is not an "acceptable medical source" under 20 CFR §§ 404.1513(a) and 416.913(a).  Therefore, his opinion cannot be used to establish the *existence* of a severe impairment.  Moreover, SSR 06-03p, 2006 WL 23299939 (Aug 9, 2006), which recognized that opinions of Nurse Practitioners may be considered to show the *severity* of an individual's impairment, was enacted after the ALJ reached his decision and is inapplicable here.

[4]  Sparks uses the term "fatigue," rather than "chronic fatigue syndrome."  While the latter is a recognized impairment, "fatigue" is merely a symptom.  However, this court construes Sparks as complaining that the ALJ erred by ignoring evidence in the record that she suffers from chronic fatigue syndrome.

15 - OPINION AND ORDER

Tests should be directed toward confirming or excluding other possible clinical conditions." *Id.* "[B]ecause chronic fatigue syndrome is diagnosed partially through a process of elimination, an extended medical history of 'nothing-wrong' diagnoses is not unusual for a patient who is ultimately found to be suffering from the disease." *Sisco v. U.S. Dept. of Health and Human Serv.*, 10 F3d 739, 745 (10th Cir 1993). "The final diagnosis is made 'by exclusion,' or ruling out other possible illnesses." *Reddick v. Chater*, 157 F3d 715, 726 (9th Cir 1998).

The ALJ found Sparks' alleged chronic fatigue to be non-severe. Tr. 49. He noted that on May 5, 2003, then treating physician Michael Ferrell, MD, found that Sparks had significant limitations due to chronic fatigue syndrome. *Id.* However, the ALJ rejected Dr. Ferrell's assessment because: (1) Dr. Ferrell did not mention the chronic fatigue syndrome in his treatment notes; (2) no other source diagnosed chronic fatigue syndrome; and (3) an August 27, 2003 evaluation by registered dietician Rentz notes that Sparks reported improved energy following the removal of several severely diseased teeth and that she probably had a chronic infection which resulted in perceived fatigue. *Id.*

The ALJ must provide "clear and convincing" reasons supported by substantial evidence for rejecting the uncontradicted opinion of a treating physician, and "specific and legitimate" reasons if the opinion is contradicted by another acceptable medical source. *Lester v. Chater*, 81 F3d 821, 830-31 (9th Cir 1995) (citations omitted). For purposes of this analysis, this court assumes that Dr. Ferrell's diagnosis is contradicted by Dr. Michaelson, a later treating physician, such that the ALJ must provide "specific and legitimate" reasons for rejecting it.

The ALJ first rejected Dr. Ferrell's assessment because he failed to mention chronic fatigue syndrome in his treatment notes. Although Dr. Ferrell noted Sparks' complaints of fatigue in 2001 and 2003 associated with night sweats, he attributed these symptoms to a menopausal

16 - OPINION AND ORDER

syndrome and placed her on hormone therapy. Tr. 192, 203. At the May 5, 2003 visit, Sparks
again complained about getting up nightly due to sweats, although the frequency was down from
the three times a night she experienced before the current hormone therapy. Tr. 248. She also
felt fatigue "more from sleep disruption than anything else." *Id*. Dr. Ferrell assessed night
sweats, interrupted sleep, and for the first time added "r/o chronic fatigue." *Id*. In a chronic
fatigue RFC questionnaire filled out that same day, he opined that Sparks suffered from chronic
fatigue syndrome, as well as night sweats, sulfite allergy, TMJD and IBS. Tr. 225. In Dr.
Ferrell's opinion, Sparks had been suffering from chronic fatigue syndrome for two to three years
(*id*); she was not a malingerer; no emotional factors contributed to the severity of her symptoms;
side effects included dizziness (Tr. 226); and she constantly experienced fatigue (Tr. 227).[5] It
does not appear from his records that he reached this opinion by ruling out other diagnoses.

Although Sparks complained of fatigue and/or night sweats to both her treating
physicians, Drs. Ferrell and Michaelson, as well as to Marks,[6] only Dr. Ferrell assessed chronic
fatigue syndrome. On April 7, 2004, Dr. Michaelson prescribed Trazadone for fatigue, which she
attributed most likely to lack of sleep. Tr. 304. On April 19, 2004, Sparks saw Dr. Michaelson
for night sweats and reported that she was sleeping five to seven hours a night, but still
experienced fatigue, although she was "sleeping better." Tr. 303. On April 23, 2004,
Sparks complained of "debilitating" night sweats and fatigue which prevented her from working
more than 20 hours a week. Tr. 301-02. Dr. Michaelson noted that the night sweats started at age

---

[5] Dr. Ferrell concluded that Sparks was incapable of even low stress jobs, could only walk 1-2 blocks without rest
(Tr. 227), sit and stand/walk with normal breaks for about 2 hours, needed to take unscheduled breaks of 30 minutes every 1-2
hours during the work day (Tr. 228), had bad days and good days, and would likely be absent from work more than four times a
month as a result of her impairments (Tr. 229).

[6] Nurse Practitioner Marks, who is not an accepted medical source to establish the existence of an impairment,
assessed menopausal night sweats, treated with Paxil, and noted that Paxil "may cause fatigue." Tr. 26.

42, post-menopausal, and assessed that Sparks had fatigue due to poor sleep and could not tolerate Trazadone.  *Id*.  In addition, evidence before the Appeals Council, which relates back to the record before the ALJ, includes treatment notes from examining physician, Heather Paladine, MD, who assessed *menopausal* symptoms, noting that Sparks reported she was "90% improved," had several "dry nights" and no longer had to change her sheets twice a night.  Tr. 36.

Even Sparks attributed her fatigue to other causes.  On March 31, 2004, Sparks told Dr. Michaelson that her night sweats seemed to be related to certain foods, like chocolate, peanuts, and milk, and subsided when she avoided these foods.  Tr. 305.  Sparks referenced roughly the same foods back in October 2002 when she complained about night sweats to her nutritionist, Signa P. Gibson, RD, CDE, and reported that she "has no symptoms unless [she] eats choc[olate] bar, raisins, peanuts."  Tr. 177.  At that time, Gibson had wondered why Sparks was still eating these foods.  *Id*.  In fact, as early as 1995, Sparks was aware of a milk allergy or intolerance, as well as a reaction to peanuts.  Tr. 197, 259.  The ALJ correctly noted that "despite being advised that [Sparks] is allergic to specific food items, the record shows that she has persisted in consuming some of these items."  Tr. 49.

The ALJ also relied on an evaluation by registered dietitian Rentz that Sparks' fatigue had another cause, namely a chronic infection.  Although Rentz is not an acceptable medical source,[7] her evaluation supports the ALJ's analysis to the extent that it was based on Sparks' own report that her energy had improved since she had her *teeth removed*.  Tr. 282.

In light of the record as a whole, the ALJ's decision to reject the evidence of Dr. Ferrell as to chronic fatigue syndrome is based on specific and legitimate reasons supported by substantial

---

[7]  See footnote 3.

evidence in the record.  According to Dr. Michaelson, Sparks' fatigue is mostly due to lack of

sleep caused by night sweats which subside when she avoids certain foods.  This is supported by

Sparks' own subjective complaints to Dr. Ferrell regarding fatigue "more from sleep disruption

than anything else."  Tr. 248.  This cause is clearly inconsistent with a diagnosis of chronic

fatigue syndrome.  The record contains other causes for Sparks' fatigue (one of which can be

controlled by Sparks avoiding certain foods) and, as the ALJ observed, a trend of improving

symptoms and improved functional abilities.  In fact, in a December 24, 2004 follow up visit

regarding food allergies, Sparks reported to Marks that she was "performing yoga about 6 days a

week and running 1 mile approximately 4 days a week."  Tr. 31.  Moreover, fatigue is a symptom

that the ALJ considered in finding Sparks not credible.  Tr. 51-53.  In conclusion, the ALJ

appropriately found that Sparks does not suffer from severe chronic fatigue syndrome.

### 4.  <u>Gastrointestinal Problems</u>

Sparks further challenges the ALJ's findings that she does not suffer from severe IBS,

contrary to the view of the medical expert, Dr. Duckler, and the new evidence submitted to the

Appeals Council.  She requests a remand to the ALJ to consider this new evidence, as well as a

consultive examination regarding her gastrointestinal problems.

While acknowledging that Sparks' treatment record regularly notes the impairment of

IBS, the ALJ found that IBS is not a severe impairment because: (1) a January 28, 1999 letter by

Dr. Ferrell stating that Sparks was, at one point, disabled by IBS, predates Sparks' alleged onset

date of disability and explains that she "is currently in as good condition as he has ever seen her,

functioning at a relatively high level;" (2) the record lacks any diagnostic studies establishing the

presence of IBS; and (3) from March 1998 to May 2003, Sparks' weight fluctuated only 12

pounds, with a low of 110, a high of 122, and a weight of 118 at the time of the hearing.  Tr. 49.

19 - OPINION AND ORDER

As noted by the ALJ, Dr. Ferrell's January 28, 1999 letter predates the onset disability date and indicates that Sparks' IBS is not severe.  Also, two years later on June 4, 2001, Dr. Ferrell assessed that Sparks was "IBS stable."  Tr. 203.  On July 31, 2002, Dr. Ferrell again assessed IBS, among other diagnoses, but made no treatment notes on the condition.  Tr. 182.

The ALJ also correctly noted that the record contains no diagnostic studies establishing the existence of IBS.  As emphasized by the Ninth Circuit in *Ukulov v. Barnhart*, 420 F3d 1002, 1005 (9th Cir 2005), claimants can "only establish an impairment if the record includes signs - the results of 'medically acceptable clinical diagnostic techniques,' such as tests - as well as symptoms."  A diagnosis of IBS "depends largely on a complete medical history and physical exam," and doctors often run "stool studies to check for infection or malabsorption problems."  Irritable Bowel Syndrome Screening and Diagnosis, The Mayo Clinic, *available at* http://www.mayoclinic.com/health/irritable-bowel-syndrome/DS00106/DSECTION=6 (last visited December 18, 2006).  "Because there are usually no physical signs to definitively diagnose irritable bowel syndrome, diagnosis is often a process of elimination," and doctors run tests such as flexible sigmoidoscopy, colonoscopy, CT scan, lactose intolerance tests, and blood tests to rule out other diagnoses.  *Id*.

After reviewing Sparks' medical charts, Dr. Duckler concluded that the charts "established a diagnosis of [IBS] with abdominal pain, nausea, fatigue, loss of appetite, bloating. A very difficult time gaining weight, occasional diarrhea and constipation, vertigo."  Tr. 382.  He noted that Sparks was treated with "Oxycodone, Tylenol, marijuana smoking to alleviate the symptoms of her [IBS]."  *Id*.  He also described a "history of esophageal reflux disease, treated with Tagamet."  Tr. 383.  However, as the ALJ pointed out, Dr. Duckler noted that Sparks "hadn't had much in the way of diagnostic studies, either for her [IBS] or her esophageal reflux

20 - OPINION AND ORDER

disease.  In other words, she hadn't had endoscopy, sigmoidoscopy, ultrasounds of abdomen,

colonoscopy . . . and no diagnostic attempt to rule out any other diseases of the GI tract."  Tr.

383-84.  Dr. Duckler concluded that as long as Sparks "stayed away" from sulfides, there would

be "no problem," and that he saw no other functional limitations.  Tr. 387-88.  Although Dr.

Duckler believed the record established that Sparks had IBS, he did not see any supporting

diagnostic studies and did not believe Sparks suffered any functional limitations from IBS.

The ALJ also relied in part on the fact that Sparks' weight fluctuated only 12 pounds

during a five-year span.  The ALJ was factually correct.  However, weight variation is just one of

many symptoms and signs of IBS, including abdominal pain, nausea, fatigue, loss of appetite,

bloating, occasional diarrhea and constipation and vertigo.  Although those other symptoms

appear in the record, the ALJ did not discuss them.

Thus, the ALJ did not err by finding that IBS is not a severe impairment.  This finding is

supported by the new evidence submitted to the Appeals Council which also discusses IBS and,

therefore, relates back to the period before the ALJ decision.

On November 16, 2004, Dr. Hill examined Sparks regarding IBS and gastroesophageal

reflux disease (GERD) and found that the esophagogastroduodenoscopy (EGD) was entirely

normal and that Sparks had been on q.i.d. dicyclomine "with essentially complete resolution of

her symptoms."  Tr. 34 (emphasis added).  In fact, Dr. Hill recommended that Hill discontinue the

q.i.d. dicyclomine (*i.e.* Bentyl) and use it only as needed for exacerbations of IBS.  *Id*.  Sparks'

GERD symptoms had also significantly improved, and Dr. Hill noted that Sparks was aware of

certain foods and lifestyle modifications she could use to avoid symptomatic GERD.  *Id*.  Because

Sparks had done "quite well," Dr. Hill decided not to schedule a follow up appointment.  *Id*.

21 - OPINION AND ORDER

However, on February 2, 2005, Sparks told allergy specialist Dr. Dibbern that she suffered from nausea, diarrhea and constipation, and attributed them to extreme IBS, for which she was still taking Bentyl and Paxil.  Tr. 28.  Dr. Dibbern conducted a physical examination which revealed a soft, nondistended abdomen, "normoactive bowel sounds present, apparently mildly and diffusely tender."  Tr. 27.  He did not make any diagnoses.  The next day, Sparks also complained to Marks about a recent exacerbation of IBS, although symptoms had "subsided."  Tr. 26.  Marks advised Sparks to she monitor her diet and avoid foods that seem to exacerbate her symptoms.  *Id*.  He also explained:

> [T]he patient requested a letter of disability for social security stating that she is unable to work because of the time that takes her to prepare her food, and her overall symptoms of not feeling well.  At this time, I have no objective way to measure disability related to her food and allergy sensitivities and would recommend she seek such a letter from the allergist, *gastroenterology*, or her naturopath.

Tr. 26 (emphasis added).

Just nine days later, Marks inexplicably changed his mind and wrote a "to whom it may concern" letter at Sparks' request, enumerating several conditions which, "taken in total, may cause [Sparks] to regularly miss several days of work per week:" IBS, history of multiple food intolerances, underweight, migraine headaches, menopausal symptoms resulting in poor sleep, and anxiety disorder with a psychiatric evaluation pending.  Tr. 24.  Since Marks is not an acceptable medical source and did not perform objective testing, this latter opinion cannot support Sparks' claim.

More importantly, based on diagnostic studies, Dr. Hill found no functional limitations due to IBS or GERD.  The opinion by Dr. Hill, a gastroenterology specialist, on IBS and GERD is entitled to great weight because "it is an opinion of a specialist about medical issues related to his

22 - OPINION AND ORDER

or her area of specialty." *Benecke v. Barnhart*, 379 F3d 587, 594 n4 (9th Cir 2004), citing 20 CFR § 404.1527(d)(5).

Thus, there is no reasonable possibility that the new evidence before the Appeals Council would have changed the ALJ's findings. Moreover, a remand for a consultive examination of Sparks' gastrointestinal problems is not necessary since Dr. Hill already performed such an examination after the hearing.

### 5. **TMJD**

Sparks also requests a remand for the ALJ to consider new evidence submitted to the Appeals Council documenting that she suffers from severe TMJD.

At step two, the ALJ found that TMJD is not a severe impairment because: (1) the treatment record contains no objective documentation of TMJD; (2) "in an emergency visit on April 1, 2003, where the treatment providers were aware of [Sparks'] history, she is described as experiencing 'atypical facial pain'" rather than TMJD; and (3) the treatment record documents an "abundance of dental problems, due to lack of dental care and advanced periodontitis, and the problem appears to have been due to a low grade infection." Tr. 49.

The ALJ's first reason is not supported by the record since the treatment record does contain documentation of TMJD. Dr. Ferrell diagnosed TMJD on multiple occasions. Three and a half years before the onset disability date, he wrote that Sparks suffered from TMJD, her condition was "relatively stable," and she was "not on any treatment for it." Tr. 231-35. On July 31, 2002, Sparks told Dr. Ferrell that she had a TMJD "flare up" after two deep teeth cleanings, but did not present any TMJD tenderness at the visit. Tr. 182. Nevertheless Dr. Ferrell once again diagnosed TMJD. *Id*. After the onset date of the alleged disability, Dr. Ferrell wrote in the

RFC questionnaire that Sparks suffers from TMJD, among other impairments, and that her impairments prevented her from working.  Tr. 225.

The ALJ's remaining reasons, however, are legitimate and persuasive.  As noted by the AJL, during an April 1, 2003 emergency visit, Dr. Rucker, the ER intake physician, assessed "atypical facial pain of *uncertain etiology*," rather than TMJD, despite being aware of Sparks' history.  Tr. 249-50.[8]  Dr. Rucker made his assessment conducted a physical examination, finding "no crepitance over her temporomandibular joint."  *Id*.

Also as noted by the ALJ, other treatment records tie Sparks' facial pain to severe dental problems and mouth infections.  On May 19, 2003, Gary Martel, DDS, noted subjective complaints of pain on the left side of Sparks' face which had only started "over the past few months" and was worse when chewing.  Tr. 245.  Dr. Martel diagnosed severe and generalized periodontal disease and probable neuralgia and concluded that Sparks would need dental extractions on many posterior teeth and upper and lower partials.  Tr. 245-46.  In fact, based on a physical examination of Sparks, Dr. Martel contradicted Dr. Ferrell's diagnosis, finding that Sparks had "a normal TMJ ROM.  No catching or locking.  No deviations or deflections.  No TMJ sounds.  Panerex shows healthy TMJs."  Tr. 245.  Moreover, on August 27, 2003, registered dietician Rentz (not an acceptable medical source) noted Sparks may have suffered from a low grade infection until she had some of her teeth removed, after which her energy improved. Tr. 282.

---

[8]  Sparks had complained of "jaw pain" on the left side, which she had experienced before, "often times associated with blister on her gums."  Tr. 249.  She denied that the pain was worse when she talked or chewed, or that the pain was associated with vibration.  Tr. 250.

Although the ALJ did not specifically mention it, Sparks also complained to Dr. Michaelson of earaches off and on "due to TMJ" (Tr. 308) and requested Tylenol # 3 for ear pain. Tr. 306. After reviewing the records from 1996-2003 sent to her by Kaiser, Dr. Michaelson noted two visits to the TMJD clinic in 1998, and remarked that despite Sparks' reporting episodic mouth sores, "no sores [were] noted in chart on numerous visits." Tr. 263. She also noted that, according to Dr. Ferrell's treatment record from March 19, 1998, Sparks responded well to acupuncture in relieving TMJD. *Id*. Dr. Michaelson wondered why Sparks was not involved in the large Kaiser study on TMJD and did not diagnose TMJD.

Despite Dr. Ferrell's diagnosis of TMJD, other substantial evidence in the record supports the ALJ's conclusion that TMJD is not a severe impairment. Dr. Martel found that Sparks' temporomandibular joint was normal, and Dr. Rucker was uncertain of the facial pain's etiology, attributing at least some of the pain to serious dental problems which Sparks apparently resolved with good results (improved energy). Even Dr. Ferrell's notes reflect no treatment and only one physical examination revealing no temporomandibular joint tenderness, which casts doubt on his response to the RFC questionnaire. *See Thomas v. Barnhart*, 278 F3d 947, 957 (9th Cir 2002) ("The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.").

New evidence before the Appeals Council adds little to the record. On February 2, 2005, Dr. Dibbern from the allergy clinic reviewed Sparks' chart and noted a history of TMJD. Tr. 27. This summary of Sparks' medical history is hardly a sufficient reason to remand to the ALJ.

**IV. <u>Step Three Listing or Equivalence to a Listing</u>**

Next, Sparks notes that she comes "very close" to meeting Listing 5.08  regarding weight loss.  Since the medical expert did not offer an opinion on the issue of equivalence, she asserts that the ALJ erred by finding that she does not meet or equal this listing.

A person's impairment only meets a listed impairment when it satisfies all the criteria of that listing.  20 CFR §§ 404.1525(c)(3), 416.925(c)(3).  Listing 5.08, entitled "weight loss due to any persisting gastrointestinal disorder," is a condition demonstrated to have persisted at least three months despite prescribed therapy and expected to persist at this level for at least 12 months, with the characteristics described either in part A or in part B.  Part A requires a weight equal to or less than the values specified in Table II, which is 98 pounds for a claimant of Sparks' 5'6" height.  Tr. 365.  At the time of the hearing, Sparks weighed approximately 114 pounds (*id*), which placed her above the maximum weight listed in part A.

Substantial evidence in the record supports the ALJ's finding that Sparks does not meet Listing 5.08 under either Part A or B.  Sparks states that she is 66.6 inches tall and now weighs 108 pounds.  For a height of 66 inches, the maximum qualifying weight in Table IV is 104 pounds.  Because she is half an inch taller and one pound lighter than the maximum measurements in Table IV, she claims that she is very close to meeting part B of Listing 5.08.  In contrast, at the hearing, Sparks testified that she was 66 inches tall and weighed approximately 114 pounds. Even accepting Sparks' contention that she is now taller and lighter than at the hearing, the maximum qualifying weight under Part B for 67 inches is 107 pounds.  Moreover, height and weight requirements are not the only criteria to qualify for the listing.  The record fails to show that she had abnormal findings on repeated examinations of one of the following objective measurements in Listing 5.08:

       1. Serum albumin of 3.0 gm. per deciliter (100 ml.) or less; or

2. Hematocrit of 30 percent or less; or
3. Serum calcium of 8.0 mg. per deciliter (100 ml.) (4.0 mEq./L) or less; or
4. Uncontrolled diabetes mellitus due to pancreatic dysfunction with repeated hyperglycemia, hypoglycemia, or ketosis; or
5. Fat in stool of 7 gm. or greater per 24-hour stool specimen; or
6. Nitrogen in stool of 3 gm, or greater per 24-hour specimen; or
7. Persistent or recurrent ascites or edema not attributable to other causes.

Nevertheless, Sparks believes that the ALJ inadequately considered equivalence to this listing because Dr. Duckler, the medical expert, never offered an opinion on the issue of equivalence and Sparks' condition, taken in its totality, equals this listing.  She relies on Dr. Dibbern's February 2005 impression that Sparks' food reactions were "largely (non-immunologic) intolerances as opposed to true allergies," although "comorbidity is possible." Tr. 29.  The Commissioner admits that Dr. Duckler did not opine whether Sparks' impairments equaled a listed impairment, but relies on two state agency medical consultants, Howard Johnson, MD (a surgeon), and J. Scott Pritchrad, DO (a specialist in internal medicine), who both found that the medical evidence in the file was insufficient to establish a diagnosis.  Tr. 56-57.

Neither the evidence in the record nor the post-hearing evidence provides a basis to find that Sparks meets Listing 5.08 based on weight loss based on a gastrointestinal disorder.  Not only is Sparks' weight above the cut-off for her height, but also, as discussed above, the evidence fails to support Spark's claim that she suffers from severe IBS.  This conclusion, however, does not foreclose the ALJ on remand from finding an equivalence to a listing based on whatever new evidence is developed on remand.

## V.  Combination of Impairments in RFC Analysis

Sparks also alleges that the ALJ failed to consider her impairments in combination in his RFC analysis.  Because the case is remanded for the ALJ to develop the record with regard to

possible mental impairments and migraine headaches, the ALJ must conduct a new RFC to reflect the new evidence.

## VI. <u>Past Relevant Work</u>

Finally, Sparks contends that the ALJ erred in concluding at step four that she could return to "past relevant work" where her previous employment does not constitute past relevant work. Although a new RFC on remand will affect the step four analysis, the court will address this legal issue which is independent of the medical evidence.

"Past relevant work" is employment performed "within the past 15 years" which constitutes "substantial gainful activity" ("SGA") and which lasted long enough for the claimant to learn to do it. *See* 20 CFR §§ 404.1560(b)(1), 416.960(b)(1). Sparks' past employment includes jobs as a food server, airline customer service agent, and baby sitter. The ALJ found that her employment in the food service industry does not qualify as "past relevant work" because Sparks is precluded from working in that industry due to her allergy to sulfites. Although the ALJ found that Sparks could return to her work in childcare, the parties agree that Sparks did not earn enough as a babysitter to pass the earnings limit for SGA.

That leaves Sparks' work as an airline customer service agent which she contends does not constitute past relevant work because she did not earn enough to qualify for SGA. Sparks held the airline customer service agent position from 1992 to 1995. Tr. 110. In 1994, she earned $7,616.68 working four hours per day, four days per week. Tr. 103, 106-07. This was the most she ever earned in this industry; her earnings for the other years were far less. *Id*. Sparks' earnings for 1994 rise to the level of SGA. Work may be SGA even if it is performed on a part-time basis. 20 CFR §§ 404.1572(a), 416.972(a); SSR 83-33, *available at* 1983 WL 31255. The evaluation guides for earnings from 1990 through June 1999 show that a claimant reaches SGA

28 - OPINION AND ORDER

levels if he or she earns an average of more than $500 per month.  20 CFR §§ 404.1574(b)(2)(i),

416.974(b)(2)(i).[9]  Sparks' earnings for 1994 are sufficient to rise to SGA levels and therefore,

her work as an airline customer service agent constitutes past relevant work.

**VII.  <u>Step Five</u>**

Because the ALJ concluded that Sparks is fit to return to past relevant work, he did not

reach step five of the analysis.  Sparks requests that because the ALJ erred at step four, the case

should be remanded so that the ALJ could obtain complete VE testimony at step five.  On

remand, the ALJ will be required to conduct a new sequential analysis which may or may not

create the need to make findings at step five.

///

///

///

///

<u>**ORDER**</u>

Based on the foregoing, the case is REMANDED to the Commissioner pursuant to

Sentence Four of 42 USC § 405(g) for further proceedings in accordance with this Opinion and

Order.

DATED this 19th day of December, 2006.

/s/  Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge

---

[9] Sparks mistakenly focuses on SGA levels after June 1999, ranging from $700 to $780 per month.

29 - OPINION AND ORDER